# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | : | |
|---|---|---|
| v. | : | 3:17-CR-008 |
| | : | (JUDGE MARIANI) |
| JEFFREY LYNN MATTOX, | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is Defendant's Amended Motion to Suppress Statements. Doc. 33. Defendant Jeffrey Lynn Mattox is charged with a single count of assault resulting in serious injury in violation of 18 U.S.C. § 113(a). The present motion seeks to suppress Defendant's statements during an interrogation conducted in the Special Housing Unit of the United States Penitentiary Canaan, where Defendant was serving a term of imprisonment at the time of the alleged assault. For the reasons that follow, the Court will grant Defendant's Motion to Suppress.

### II. BACKGROUND

On October 4, 2016, Mattox was serving a term of imprisonment at the United States Penitentiary at Canaan ("Canaan"). On that day, Mattox and co-Defendant Clayton John Shinn were involved in an altercation with another inmate, James Arthur. The altercation led to charges of intentional assault against Mattox and Shinn. On July 14, 2017, Mattox filed a motion to suppress statements he made during an interview regarding the altercation.

Doc. 33. According to the government, the interview was conducted pursuant to an administrative policy from the Bureau of Prison ("BOP"), which "requires that interviews be conducted, or at least attempted, of all inmates involved in inmate on inmate assaults, and that a written administrative report be generated regardless of whether the incident is pending criminal prosecution or not." Doc. 41 at 3.

According to the administrative report regarding the altercation, Lieutenant Wladimir Vizcaino conducted interviews of Arthur, Mattox, and Shinn and created a written report from these interviews. Doc. 34-1. The report summarizes the October 4, 2016 altercation as follows:

> On October 4, 2016, at approximately 7:22 p.m., the Unit F-1 Officer observed inmates Shinn, Clayton, #27365-064, and Mattox, Jeffrey, #13372-032, striking inmate inmates [sic] Arthur, James, #14153-088, in the head and upper body with closed fists in Unit F-1, Cell #115. Staff ordered the inmates to cease their [fighting] and to submit to restraints. The inmates complied and were escorted from the area. Inmates Shinn and Mattox were medically assessed and placed in the Special Housing Unit without further incident. Inmate Arthur was medically assessed and transported to an outside hospital for additional evaluation and treatment

*Id.* at 2. The report states that all three men were interviewed in the Lieutenant's Office on October 18, 2016. *Id.* at 3. Arthur purportedly stated that Mattox and Shinn told him that he needed to provide his legal paperwork to prove that he is not a sex offender. *Id.* Arthur told Mattox and Shinn that he could not show them his paperwork, and Shinn and Mattox repeatedly kicked him and struck him with closed fists. *Id.* Arthur also stated that if he returned to the General Population of Canaan, he would likely be assaulted again. *Id.*

According to the report, Mattox stated during his interview that Arthur is a sex offender and that "anyone that has children would have reacted the same way." *Id.* He also stated that Arthur will be assaulted again if he is returned to General Population. *Id.* According to the report, Arthur "sustained a laceration to his right eyebrow, a hematoma to his right eye and multiple abrasions to the right side of his head and face." *Id.* at 4.

Mattox was interviewed in the Special Housing Unit ("SHU") for his October 18, 2016 interview. According to the government, he had been "serving disciplinary segregation" at SHU at the time, presumably since the assault occurred on October 4, 2016. Doc. 41 at 4. The government states that Mattox was not given *Miranda* warnings prior to his interview "because these types of interviews are considered voluntary under BOP policy, and any inmate is free to decline to answer any or all questions." *Id.* The government argues that Mattox "is familiar with his rights inside the BOP because he has been the subject of multiple disciplinary reports." *Id.* At an evidentiary hearing held on June 13, 2018, Lieutenant Vizcaino testified that he was required to investigate all inmate altercations in order to determine whether to take disciplinary action against the inmate, including interviewing anyone involved in the incident and documenting those interviews in a written report. On October 18, 2016, Lieutenant Vizcaino arranged to interview Mattox in an office located inside SHU. Mattox was escorted from his cell to the interview room.

During the interview, Lieutenant Vizcaino was not armed, nor was he in uniform. He had a radio and a set of restraints with him. Mattox was handcuffed behind his back

3

pursuant to BOP policy, which dictates that all inmates moving from their cell need to be restrained. No one else was inside the interview room. Lieutenant Vizcaino testified that the entire interview lasted about two minutes, during which he asked Mattox what happened and whether Arthur can return to General Population without being assaulted again. He did not provide Mattox *Miranda* warnings during the interview, nor did Mattox affirmatively state that he did not wish to be questioned. Lieutenant Vizcaino testified that in his experience, he has come across inmates who stated that they do not wish to be interviewed, but it is not required for the officers conducting the interview to specifically tell each inmate that they do not have to respond to questioning. He is not aware if anyone told Mattox that he was not required to answer questions during the interview. Finally, Lieutenant Vizcaino testified that Mattox had been placed in SHU since October 4, 2016, and that he was not placed there for the purposes of questioning, but for disciplinary purposes. Thus, Mattox was not free to leave SHU from the time of the altercation to the time of the interview. On November 9, 2016, FBI opened a case against Mattox and Shinn for intentional assault, after the case had been referred to them by officials at Canaan.

## III. Discussion

The issue before the Court is whether Mattox, an inmate at the time of the investigation relating to the charges against him, was subject to custodial interrogation without being informed of his *Miranda* rights during his interview with Canaan officials on October 18, 2016. The Fifth Amendment to the United States Constitution provides that no

person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. "[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'" *Pennsylvania v. Muniz*, 496 U.S. 582, 589, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990) (quoting *Miranda v. Arizona*, 384 U.S. 436, 461, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). The Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. Commonly known as the "*Miranda* warnings," a defendant in police custody

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479.

"No *Miranda* warning is required absent a 'custodial interrogation.'" *United States v. Savage*, 677 F. Supp. 2d 756, 763 (E.D. Pa. 2009); *see also Miranda*, 384 U.S. at 444. "Because the presence of *both* a custodial setting and official interrogation is required to trigger the *Miranda* right-to-counsel prophylactic, absent one or the other, *Miranda* is not implicated." *Alston v. Redman*, 34 F.3d 1237, 1244 (3d Cir. 1994) (emphasis in original). "[T]he determination of whether statements are the product of such 'custodial interrogation'

must be made on a case-by-case basis." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (citations omitted).

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (footnote omitted). In this case, the government does not dispute that the interview questioning amounted to an interrogation. At the evidentiary hearing, Lieutenant Vizcaino testified that while he did not recall whether Mattox had been referred to the FBI for criminal charges at the time of the interview, he was aware that the statements had the potential of being used in criminal proceedings. In fact, Mattox was referred to the FBI for potential criminal prosecution following his October 18, 2016 interview, and was subject to an interview by an FBI agent regarding the assault. Finally, during the interview itself, Mattox was asked why the altercation occurred and whether the victim can return to general population (in other words, whether Mattox would assault the victim again if he returned). Such questioning is undeniably likely to evoke an incriminating response that may be used later against Mattox in a criminal prosecution. At the evidentiary hearing, Lieutenant Vizcaino testified that he viewed the interview as an "administrative" matter. However, "the interrogation analysis focuses 'primarily upon the perceptions of the suspect, rather than the intent of the police.'" *United States v. Brownlee*, 454 F.3d 131, 147

6

(3d Cir. 2006) (quoting *Innis*, 446 U.S. at 301) (concluding that defendant suspected of carjacking was subject to interrogation when the officer asked him "(1) How did you get out of there? (2) Did you get hurt? (3) Why would you do something dumb like this? (4) With a gun?"). Thus, the key issue before the Court is whether Defendant was in custody when he was interrogated by Lieutenant Vizcaino.

In determining whether an individual is in custody, "the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509, 132 S. Ct. 1181, 1189, 182 L. Ed. 2d 17 (2012) (internal citations and quotation marks omitted). However, the freedom of movement inquiry "is simply the first step in the analysis, not the last." *Id.* "Not all restraints on freedom of movement amount to custody for purposes of *Miranda*." Instead, courts must also ask "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

In the context of questioning an inmate, the Supreme Court has declined to adopt a bright line rule that imprisonment alone is sufficient to constitute custody within the meaning of *Miranda*. *Id.* at 511. Rather, "the determination of custody should focus on all of the features of the interrogation," including "the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." *Id.* at 514 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004)); *accord Bruce v. United States*,

7

439 F. Supp. 2d 364, 371 (M.D. Pa. 2006) ("Because restraint on freedom is the status quo of a prisoner, the courts examine the totality of the circumstances surrounding the interrogation to ascertain whether the defendant should be deemed 'in custody' for purposes of *Miranda*.").

In *Howes*, the Supreme Court found that several factors weighed in favor of finding custody, including the facts that "respondent did not invite the interview or consent to it in advance, and he was not advised that he was free to decline to speak with the deputies"; "[t]he interview lasted for between five and seven hours in the evening and continued well past the hour when respondent generally went to bed; the deputies who questioned respondent were armed; and one of the deputies...[u]sed a very sharp tone." *Id.* at 515. However, the Court found these circumstances "were offset by others," including, "[m]ost important[ly], respondent was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted." *Id.* This, coupled with the facts that the inmate "was not physically restrained or threatened and was interviewed in a well-lit, average-sized conference room... was offered food and water, and the door to the conference room was sometimes left open," was sufficiently "consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." *Id. See also Schreane v. Ebbert*, 864 F.3d 446, 453 (6th Cir. 2017) (noting that *Howes* "eschewed a bright line rule" in favor of several factors for the court to consider, including "(1) the location of the questioning; (2) the duration of the

questioning; (3) statements made during the questioning; (4) the presence of physical restraints; and (5) the release of the inmate after the questioning"), *cert. denied*, 138 S. Ct. 519, 199 L. Ed. 2d 399 (2017).

It is against the backdrop of *Howes* that the Court must evaluate the circumstances surrounding Mattox's interview. Here, the "most important" factor enumerated by *Howes* was not present, that is, Mattox was never told he "could leave and go back to his cell whenever he wanted." *Howes*, 565 U.S. at 515. The government argues that *Miranda* warnings were not required for Mattox's interrogation "because these types of interviews are considered voluntary under BOP policy, and any inmate is free to decline to answer any or all questions." Doc. 41 at 4. However, the government appears to assume—without presenting any evidence—that Mattox had known that he was free to decline answering any questions. Nowhere in Lieutenant Vizcaino's report does it state that he informed Mattox, Shinn, or any other witness that they were free to not answer the interview questions. At the evidentiary hearing, Lieutenant Vizcaino conceded that he did not provide Mattox *Miranda* warnings during the interview, nor did Mattox affirmatively state that he did not wish to be questioned. Instead, Lieutenant Vizcaino appeared to presume that Mattox would have invoked his right to refuse to answer if he had wished to do so, because he has seen other inmates invoke their right to not be interviewed in other interrogations.

Such presumptions are woefully insufficient to support a finding that Mattox was informed of his right to end the questioning. Without being informed of this right, a

reasonable inmate cannot be presumed to have understood that he would be free to decline the interview. *Cf. United States v. Gojah*, 553 F. App'x 159, 162 (3d Cir. 2014) (finding defendant was not in custody for *Miranda* purposes and noting that "*most importantly*, Gojah was explicitly informed that he could choose not to answer [ICE agent's] questions") (emphasis added); *Holland v. Rivard*, 800 F.3d 224, 238 (6th Cir. 2015) (finding that "a reasonable person in Holland's position would have felt free to terminate the questioning" when "Holland was read his *Miranda* rights on 'at least ... four separate occasions' during the January 12 and 13, 2006 interviews, clearly placing Holland on notice that he did not have to speak with police").

Furthermore, Mattox had been placed in SHU for a period of fourteen days from the time of the assault to the time of the interview. At the hearing, Lieutenant Vizcaino admitted that Mattox was placed in SHU not for purposes of questioning, but for internal discipline. Thus, this is unlike the common inmate case where "[r]eturning to his cell would merely have returned him to his usual environment." *Howes*, 565 U.S. at 516. Instead, Mattox had been confined to a different, disciplinary unit for two weeks prior to the interview, and was escorted back to that disciplinary unit, instead of returning to his cell, after the interview. Finally, Mattox had been restrained for the duration of the interview, as well as when he was being transported to and from the interview room, which further suggests a custodial environment. While it is true that the interview lasted only a few minutes, and Lieutenant Vizcaino was not armed during the interview, these facts are not sufficient to overcome the

other salient factors indicating custody. Taking into account of the totality of the circumstances, especially the undisputed fact that Mattox was not informed that he was free to decline to answer the questions, the Court finds that he was in custody for *Miranda* purposes when he was questioned by Lieutenant Vizcaino about the assault. Accordingly, Mattox's statements were taken in violation of his Fifth Amendment rights and will therefore be suppressed.

In arguing that Mattox is not in custody, the government devotes a significant portion of its brief to arguing that Mattox's statements were voluntary because "[t]here is nothing present in the facts of this case even suggestive of the defendant's will being overborne by a coercive environment or questioning." Doc. 41 at 9. The government's emphasis on voluntariness, however, is misplaced. Regardless of whether or not the statements were voluntary, "the prosecution *may not* use statements, whether exculpatory or inculpatory, stemming from *custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444 (emphasis added). In other words, *Miranda* established a separate inquiry as to when the defendant's statements must be suppressed; it is not meant to replace, or be conflated with, the voluntariness inquiry. *See, e.g., Oregon v. Elstad*, 470 U.S. 298, 307, 105 S. Ct. 1285, 1292, 84 L. Ed. 2d 222 (1985) ("[U]nwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*."); *Taylor v. Cardwell*, 579 F.2d 1380, 1383 n. 2 (9th Cir. 1978)

11

("While *Miranda* extended the Court's protection to custodial statements that were not clearly involuntary under traditional standards, it certainly did not abolish the traditional [voluntariness] analysis.") (internal citations omitted); *United States v. Flores*, 313 F. Supp. 2d 1188, 1202 (D. Utah 2004) ("Separate from the issue of voluntariness is the application of the *Miranda* doctrine. *Miranda* requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"); *United States v. Jones*, 2018 WL 935396, at *20 (E.D. Va. Feb. 16, 2018) ("Separate and apart from any *Miranda* concerns, 'statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will.'") (quoting *Florida v. Royer*, 460 U.S. 491, 501 (1983)).

Here, because Mattox's statements will be suppressed due the lack of *Miranda* safeguards in a custodial interrogation, the Court need not decide whether his statements should also be suppressed because they are involuntary for purposes of this motion. However, the Court notes that at trial, Mattox's "un-*Mirandized* statements may be used to impeach, as long as they were made voluntarily." *United States v. Lenegan*, 425 F. App'x 151, 153 (3d Cir. 2011). *See also Mincey v. Arizona*, 437 U.S. 385, 397-398, 98 S. Ct. 2408, 57 L.Ed.2d 290 (1978) ("Statements made by a defendant in circumstances violating the strictures of *Miranda v. Arizona* [] are admissible for impeachment if their trustworthiness...satisfies legal standards. But any criminal trial use against a defendant of his involuntary statement is a denial of due process of law, even though there is ample

12

evidence aside from the confession to support the conviction.") (internal citations and quotation marks omitted). Thus, the Court will conduct the voluntariness inquiry as to Mattox's statements for purposes of potential impeachment use at trial.

A statement is involuntary when the defendant's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In determining whether a statement is voluntary, courts must consider "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)). "These surrounding circumstances include 'not only the crucial element of police coercion,' but may also include 'the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health.'" *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002) (first quoting *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), then quoting *Withrow v. Williams*, 507 U.S. 680, 693, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993)). "A suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account in the voluntariness inquiry." *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1046, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983)). "Further, there must be some causal connection between the police conduct and the confession." *Id.*

(citing *Connelly*, 479 U.S. at 164). "The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary." *Id.* at 108-09 (citing *Lego v. Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972)).

Upon examining the circumstances of the interview, the Court finds that Mattox's statements were made voluntarily. Mattox had been imprisoned at the time of the underlying events. He is well aware of the dynamics between the inmates and the correctional officers investigating inmate altercations. There is nothing in the record that would call into question Mattox's maturity, education, mental or physical health at the time of the interview. Although the circumstances of the interview in SHU were sufficient for a finding of custodial interrogation, they are not so coercive as to support a finding that his will was overborne during the interview. While Mattox was handcuffed during the interview, the interview lasted only a few minutes and there was no indication that Lieutenant Vizcaino used physical force or threatened him in any manner. *See, e.g., United States v. Latz*, 162 F. App'x 113, 118 (3d Cir. 2005) (noting that, while "[t]he challenged interrogation was far from exemplary, and Latz should have been mirandized," the Court "cannot find that Latz's will was overborne" when "nothing suggests, and Latz does not contend, that [the officer] pointed the shotgun at Latz during the questioning"; "there is no evidence that Latz was threatened"; and the officer "told Latz that he did not have to talk"). Based on the totality of the circumstances, the Court finds that Mattox's statements, while obtained in violation of *Miranda*, are voluntary, such that they may be used at trial for impeachment purposes. *See*

*Elstad,* 470 U.S. at 307–08 ("Despite the fact that patently *voluntary* statements taken in violation of *Miranda* must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination.") (citing *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (emphasis in original).

## IV. CONCLUSION

For the reasons outlined above, this Court will grant Defendant's Motion to Suppress. Doc. 33. A separate Order follows.

Robert D. Mariani
United States District Judge